OSCN Found Document:IN THE MATTER OF THE ADOPTION OF B.T.S.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 IN THE MATTER OF THE ADOPTION OF B.T.S.
2016 OK CIV APP 21
Case Number: 113714
Decided: 03/07/2016
Mandate Issued: 04/14/2016
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2016 OK CIV APP 21, __ P.3d __

 

IN THE MATTER OF THE ADOPTION OF B.T.S., a Minor Child:

TAMERA N. SMITH, Appellant,
v.
TERESA NIXON and QUAHANA NIXON, Appellees.

APPEAL FROM THE DISTRICT COURT OF
CHEROKEE COUNTY, OKLAHOMA

HONORABLE SANDY CROSSLIN, TRIAL JUDGE

AFFIRMED AS CORRECTED

Maria Tasi Blakely, Hugo, Oklahoma and Charlie Rowland, ROWLAND LAW FIRM, PLLC, Antlers, Oklahoma, for Appellant
Tim K. Baker, Kimberly N. Clark, TIM K. BAKER & ASSOCIATES, Tahlequah, Oklahoma, for Appellees

DEBORAH B. BARNES, JUDGE:

¶1 Appellant Tamera N. Smith (Mother) appeals from an Order of the trial court determining B.T.S. eligible for adoption without her consent. Mother's appeal raises questions of law concerning deficiencies in the notice she received from Appellees Teresa Nixon and Quahana Nixon (collectively, Adoptive Parents) regarding their application for an order determining B.T.S. eligible for adoption without her consent; the burden of proof applied by the trial court in reaching its determination of such eligibility; and the court's lack of subject matter jurisdiction to render a decision about B.T.S.'s eligibility for adoption because another Oklahoma district court in a different county previously granted guardianship over B.T.S., a guardianship that was ongoing at the time the present proceedings were filed. We affirm the Order as corrected.

BACKGROUND

¶2 B.T.S. was born on November 19, 2005, to Mother and Jerrett Shields (Father), who were unwed. Father is a member of the Chickasaw Nation and all parties agree B.T.S. is an Indian child as defined by state and federal law. Tammy Smith is Mother's mother and B.T.S.'s maternal grandmother. On April 12, 2007, Smith and Teresa Nixon, Mother's aunt, were appointed, with Mother's consent, as B.T.S.'s co-guardians in McCurtain County.

¶3 B.T.S. has lived with Adoptive Parents for about eight years. On July 2, 2014, Adoptive Parents filed a petition for adoption of B.T.S. in Cherokee County, as well as an application for an order terminating Mother's and Father's parental rights, and an order determining B.T.S. eligible for adoption without Mother's and Father's consent. Adoptive Parents alleged, pursuant to 10 O.S. 2011 § 7505-4.2(B) and (H)[1] that Mother and Father failed to pay child support for twelve consecutive months out of the last fourteen months preceding their petition and failed to maintain a significant relationship with B.T.S. for twelve consecutive months out of the last fourteen months preceding the filing of their petition for adoption. On that same date, Adoptive Parents also filed a "Notice of Hearing" to Mother, Father, and the Chickasaw Nation. Return of summons was filed July 14, 2014, as to Mother, and August 4, 2014, as to Father. The return of service to the Chickasaw Nation was filed of record on April 15, 2015; however, the return of service shows it was served on July 7, 2014.

¶4 The trial court ordered a court-appointed attorney for Mother. On October 23, 2014, Mother filed her response to the applications denying most of the allegations in the applications. Mother alleged as a "counterclaim" that she filed a motion to have the co-guardianship dismissed because she has rectified the conditions that led to the co-guardianship. She also alleged she has maintained a relationship with B.T.S. to the best of her ability and to the extent allowed by the co-guardians, and that she has contributed and continues to contribute to the support of B.T.S. She also alleged the petition contained a material misrepresentation; that is, Quahana Nixon has never had legal custody of B.T.S., only physical custody, because Ms. Smith is the other co-guardian. Mother asked the court not to terminate her parental rights nor deem B.T.S. eligible for adoption without her consent.

¶5 The court also appointed a guardian ad litem who filed a report on September 10, 2014, and filed a supplemental report on November 17, 2014, after interviewing Mother. The GAL found, among other things, that B.T.S. was thriving in the care of Adoptive Parents. The supplemental report did not alter the GAL's original report that it would be in B.T.S.'s best interests to determine B.T.S. eligible for adoption without Mother's consent. According to the supplemental report, Mother told the GAL she suffered post-traumatic stress disorder, has been diagnosed as bi-polar and schizophrenic, and has had sporadic contact with B.T.S. during the guardianship period and had last seen B.T.S. in June of 2014. The GAL also reported Mother said she is engaged to a James Voss who has been employed for twelve years. The report states Mother and Voss live on his salary, her disability payments of $721 per month, and food stamps.

¶6 A hearing was held on November 17, 2014, on the application to determine B.T.S. eligible for adoption without Mother's and Father's consent. Mother asserted a jurisdictional issue was presented because the guardianship was in place in a different county. Mother argued Ms. Smith, the co-guardian, was a necessary party in these proceedings though she referred to no statutory or decisional law for the argument. Mother also admitted the guardianship court was aware of the present proceedings and was waiting to rule on her petition to vacate the guardianship pending the outcome of these proceedings. The court found the co-guardian was not a necessary party in an adoption matter and overruled Mother's objection.

¶7 During the hearing, Father admitted he had not maintained a relationship with B.T.S. during the relevant period nor had he paid child support in seven years. Father testified he believed adoption was in B.T.S.'s best interests. The court also heard the testimony of Mother and Voss. Mother maintained she had given money and purchased clothes and school supplies for B.T.S. during the relevant period, but that these sums were given to her mother to give to B.T.S. and Adoptive Parents. Mother, however, failed to produce any records except for one $100 check given during the relevant period although she claimed to have the records documenting other payments. Mother and Voss also claimed Mother maintained a relationship with B.T.S. during the two-week period each summer that Ms. Smith had physical custody of B.T.S. though Mother was also unable to produce more than a few pictures that she testified showed B.T.S. at a swimming pool in June 2014, three pictures of an Easter 2014 visit, and three pictures of a September 2013 get together. The court also heard the testimony of Adoptive Parents who disputed Mother paid child support or otherwise provided gifts or clothing to B.T.S. during the relevant period and disputed Mother maintained any meaningful relationship with B.T.S.

¶8 At the conclusion of the hearing, the trial court announced Adoptive Parents had met their burden as to Father and determined B.T.S. eligible for adoption without Father's consent. As to Mother, the trial court noted "conflicting evidence" was presented, but that it was presented with no evidence "that would rebut the proof provided by" Adoptive Parents who by clear and convincing evidence met their burden of proof.

¶9 The court filed its Order on March 27, 2015, in which the court found notice had been provided pursuant to the provisions "of 10 O.S. § 29.1 and 10 O.S. § 7505-4.1 et seq." and that it had jurisdiction pursuant to 10 O.S. 2011 § 7502-1.1. The court further found Adoptive Parents had had "physical custody" of B.T.S. since April 12, 2007, by way of the guardianship order in McCurtain County. The court found by clear and convincing evidence that Mother's and Father's consent to the adoption of B.T.S. was not required because they failed to provide support for B.T.S or to maintain a meaningful parental relationship with B.T.S. during the relevant period and ordered B.T.S. eligible for adoption without their consent.

¶10 Mother filed this appeal.[2]

 

STANDARD OF REVIEW

 

¶11 Questions of law are reviewed under a de novo standard of review, without deference to the trial court's conclusion. In re A.N.O., 2004 OK 33, ¶ 3, 91 P.3d 646; Kluver v. Weatherford Hosp. Auth., 1993 OK 85, ¶ 14, 859 P.2d 1081. Statutory interpretation presents a question of law. State v. Tate, 2012 OK 31, ¶ 7, 276 P.3d 1017. "When making a determination of a child's eligibility for adoption without consent, an appellate court will review issues of fact under a clear and convincing standard." In re Adoption of G.D.J., 2011 OK 77, ¶ 17, 261 P.3d 1159 (citation omitted). Additionally, "[t]he burden is on the party seeking to adopt without consent to prove such adoption is warranted by clear and convincing evidence. 'Accordingly, the decision of the trial court will not be disturbed unless it fails to rest on clear and convincing evidence.'" Id. (citation omitted).

ANALYSIS

I. Noncompliance with Oklahoma Indian Child Welfare Act

¶12 Father is a member of the Chickasaw Nation. Mother is non-Indian. However, it is uncontested that B.T.S. is an Indian child and that the provisions of the Federal Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (2012) (ICWA), and the Oklahoma Indian Child Welfare Act, 10 O.S. 2011 §§ 40-40.9 (OICWA) apply in this case. Pursuant to OICWA § 40.3(A), except in circumstances not herein relevant, "[OICWA], in accordance with [ICWA], applies to all child custody proceedings involving any Indian child . . . ." Mother argues Adoptive Parents' failure to comply with certain notice provisions of OICWA deprived the trial court of jurisdiction to determine B.T.S. eligible for adoption without Mother's consent.

¶13 Mother argues Adoptive Parents never notified the United States Bureau of Indian Affairs of their applications to determine B.T.S. eligible for adoption and termination of Mother's parental rights, as required by 10 O.S. 2011 § 40.4.[3] Further, Mother argues the required "notice" is something other than the "petitions" and that notice requires particular information including "[t]he child's tribal affiliation[,] . . . [a] statement that the appropriate tribe, as well as the biological parents or 'Indian custodians' have the right to intervene in the proceedings," and a "statement that any biological parent, the tribe, or the Indian custodians have the right to transfer the proceeding to the tribal court of the Indian child."[4] Mother claims that, on its face, the "Notice of Hearing" sent to her was fatally defective because, among other errors, it did not notify her that the Chickasaw Nation had a right to intervene, and she was not notified she had a right to have the proceedings transferred to the Chickasaw Nation tribal court.[5] Mother asserts lack of proper notice deprives the trial court of subject matter jurisdiction and is an issue properly raised for the first time on appeal, citing Halliburton v. Grothaus, 1998 OK 110, ¶ 10, 981 P.2d 1244.

¶14 Adoptive Parents do not contest Mother's factual allegations and the record on appeal reveals no notice was sent to the BIA nor did Mother's Notice of Hearing inform her that the Chickasaw Nation could intervene or that she could seek transfer of the proceedings to the Chickasaw Nation tribal courts. The service of process, however, states Mother was served with the petition for adoption in which B.T.S.'s tribal affiliation was asserted to be the Chickasaw Nation. The Notice of Hearing sent to the Chickasaw Nation does contain the information required by § 40.4, including the language pertinent to the biological parent. That notice was filed of record on July 2, 2014, the same day Mother's Notice of Hearing was filed. Mother has been represented by counsel throughout these proceedings.

¶15 In Halliburton, the Oklahoma Supreme Court stated the well-recognized rule that,

A district court judgment or order is facially void if, on an inspection of the judgment roll, it is apparent that one or more of the requisite jurisdictional elements - that of the subject matter, in personam cognizance, or the court's power to render a particular decision - is shown to have been absent. Whenever absence of cognizance appears on the face of the judgment roll, the judicial act is void and subject to attack at any time.

Id. ¶ 10 (footnotes omitted). Mother, however, offers no other decisional authority for her position that the Order must be reversed because the trial court had "no subject matter jurisdiction." Nevertheless, because fundamental parental interests are at stake in this matter, we have undertaken our own review of persuasive authority pertinent to the claims raised by Mother.[6]

¶16 Mother bases her argument for reversal on Adoptive Parents' failure to follow the notice requirements of OICWA, not ICWA. In addressing her arguments, however, we find instructive decisional law discussing the effect of inadequate notice in cases involving ICWA notice requirements as well as state notice requirements.

¶17 In In re Adoption of Baby Girl B, 2003 OK CIV APP 24, 67 P.3d 359, another Division of this Court addressed, among other issues, the effect of inadequate notice to both the father of the child and the tribal nation pursuant to both § 1912 and § 40.4. The Court noted the language in § 1914 authorizing "any parent from whose custody such child was removed" to petition the court to vacate its decision upon a showing of a violation of § 1912, among other sections, and noted that the challenge before it was to the notice given to the father and to the nation. Father never had custody of the child, but he also had had no notice of the child's birth or that he was the child's father; once he was so notified, he took steps to establish paternity and provide support. The Court determined ICWA and OICWA applied and father was a parent for purposes of those acts. The Court went on to determine the adequacy of the notice provided to father and the nation, and the effect of any inadequacies in the notice provided on the trial court's ruling.

¶18 In Baby Girl B, the father and the nation argued the notice served upon father did not comply with the provisions of § 40.4 because the notice lacked the child's tribal identification, a statement of rights, and advice regarding his right to counsel. Although father did receive notice of the hearing on termination of his parental rights - a hearing he ultimately missed because he was lost and arrived after the hearing had already concluded - the Court found

the notice elements missing here clearly go to more than the notice of time and date of a hearing. Obviously, Father was not represented by chosen or appointed counsel at a critical stage of these proceedings. No evidence exists showing he had waived a right to counsel. In fact, he testified that he believed he was represented by Nation's counsel, but that was not the case at that time.

Id. ¶ 45 (emphasis added). Further, the Court concluded: "Adoptive Parents . . . were under an obligation to furnish adequate notice and wholly failed to do so. They have not shown any excuse for the failure to give adequate and correct notice, nor any basis to excuse the failure such as lack of prejudice." Id. ¶ 46 (emphasis added).

¶19 Under the facts presented, the Baby Girl B Court found the inadequate notice as to father required reversal of the termination order, but also found that while notice to the nation was defective, "the trial court's decision not to invalidate on this ground is not clearly error because of the absence of prejudice to Nation." Id. ¶ 54 (emphasis added).

¶20 Other jurisdictions have also considered the effect of an absence of prejudice or lack of harmful error in circumstances where notice has been deficient as to a parent or a tribe pursuant to the notice requirements of ICWA and state law requirements. For example, the Alaska Supreme Court discussed the effect of defective notice to an Indian parent in a termination of parental rights case though the issue had been raised for the first time on appeal. In In re L.A.M., 727 P.2d 1057 (Alaska 1986), the Alaska Supreme Court addressed the mother's assertion that the mere publication of notice of the parental rights termination proceeding failed to comply with the notice requirements of the ICWA § 1912(a), and Alaska's Indian child welfare provisions. The court explained:

Unless it constitutes plain error, we ordinarily will not consider a claim of error if it was not both argued in the trial court and properly raised on appeal. In order for this court to find plain error, the error must affect substantive rights and be obviously prejudicial. . . . "[P]lain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted."

In re L.A.M., 727 P.2d at 1059 (citations omitted).

¶21 The Alaska Supreme Court found the case before it to be such a case. The court reasoned:

The due process right to proper notice in a parental rights termination proceeding is so fundamental that justice requires us to consider [mother's] claim of defective notice. Furthermore, the ICWA specifically authorizes a parent to "petition any court of competent jurisdiction to invalidate [a termination of parental rights] upon a showing that such action violated" certain ICWA provisions, including the act's notice requirements. 25 U.S.C. § 1914. The guardian ad litem relies on this provision to argue that [mother] has a right under federal law to be heard on the defective notice issue even though it was not raised below.

In re L.A.M., 727 P.2d at 1059 (footnote omitted). Although the Alaska court noted there was little case law interpreting § 1914, the court found the guardian ad litem's interpretation to be consistent with the broad purposes of ICWA in promoting stability among Indian tribes and families and with the section's legislative history. Thus, the Alaska court concluded, because the state failed to satisfy ICWA's requirement of notice by registered mail, the order terminating the mother's parental rights required reversal "unless the procedural violation was harmless because the mother had actual notice of the termination hearing." Id. at 1061 (emphasis added). The court found on the record before it that mother had no actual notice; therefore, the court reversed the order of termination.

¶22 Though not addressing state law notice requirements, other courts have similarly addressed ICWA's notice requirements with reference to the parents or tribe's actual notice and participation in the proceedings. For example, in In re H.A.M., 961 P.2d 716 (Kan. App. 1998), the appellate court held the trial court's failure to give notice to the Chickasaw Nation regarding a termination of parental rights proceeding and to foster care placement proceedings commenced prior to the termination proceedings did not require reversal of the case where the tribe ultimately became involved in the proceedings. In response to the parents' argument on appeal that the failed notice requirements required reversal of the termination order, the In re H.A.M. court held:

Considering the Chickasaw Nation's involvement in this case, albeit belated, there was substantial compliance with the ICWA purpose of involving the tribe in the child care proceedings. Of great importance is the apparent belief by the Chickasaw Nation that the trial court remedied the initial failure to give notice with its subsequent actions.

Id. at 720. See also In re J.J.G., 83 P.3d 1264 (Kan. App. 2004), disapproved on other grounds in In re B.D-Y., 187 P.3d 594, 606 (Kan. 2008) (Appellate court found the tribe's actual participation in all custody proceedings regarding the child, including scheduling for the termination proceedings, rendered father's notice argument unpersuasive.).

¶23 In none of these decisions were inadequacies in the notice requirements of § 1912 or § 40.4 determined to be jurisdictional deficiencies as argued by Mother, but rather procedural deficiencies which could be raised for the first time on appeal; however, we review errors in notice deficiencies for prejudice. "Absent a showing of prejudice, any error is harmless and an insufficient basis for reversal." E&F Cox Family Trust v. City of Tulsa, 2013 OK CIV APP 45, ¶ 34, 302 P.3d 1168 (citations omitted).

As to alleged errors, not inherently prejudicial, the test of prejudice is: "The likelihood that the verdict would have been different had they not occurred as measured by the usual criterion of the verdict's support in the evidence." Karriman v. Orthopedic Clinic, 1973 OK 141, ¶ 21, 516 P.2d 534, 540. Error does not require reversal unless examination of the entire record discloses that miscarriage of justice probably has resulted, or that there was a violation of statutory or constitutional rights. Falletti v. Brown, 1971 OK 18, ¶ 8, 481 P.2d 744, 746.

Malloy v. Caldwell, 2011 OK CIV APP 26, ¶ 18, 251 P.3d 183.

¶24 The record indicates Mother had notice of her rights to intervene and to seek removal of the proceeding to the Chickasaw Nation tribal courts. She did not receive this notice from Adoptive Parents as required under § 40.4, but the notice of hearing sent to the Chickasaw Nation is in the record and was filed the same day Mother's defective notice was filed. Unlike the father in Baby Girl B, Mother was represented by counsel at all critical stages of this proceeding and Mother has fully participated in these proceedings. The contents of the record were plainly available to her. Mother has thus failed to explain how she was prejudiced by the defective notice.

¶25 Further, as argued by Adoptive Parents, Mother has failed to demonstrate how the outcome of the proceeding would have been different had she received proper notice from them, although she poses rhetorical questions about whether she would have asked the Chickasaw Nation to intervene or whether she would have sought transfer to its tribal courts. Although the July 17, 2014 return receipt of service from the Chickasaw Nation was belatedly entered of record, Mother does not dispute that the Chickasaw Nation had proper notice prior to the originally scheduled September 11, 2014 hearing. That hearing was then continued to November 17, 2014. The Chickasaw Nation declined to intervene in the matter or seek transfer of the proceedings to its tribal courts.[7] Thus, Mother offers nothing to demonstrate that removal could or would have occurred even if she sought it.

¶26 Moreover, as previously noted, Mother was represented by court-appointed counsel. On July 2, 2014, Adoptive Parents filed their petition for adoption and their applications for an order determining B.T.S. eligible for adoption without the consent of his natural parents and order terminating the parental rights of the natural parents. According to the trial court's docket, on July 14, 2014, affidavit of service was filed showing Mother had been served, and, according to the trial court's docket, Mother was appointed legal counsel on August 4. Also according to the docket, on September 22, a motion was made to continue the hearing and the court entered its order and notice of hearing on November 17, 2014. On October 23, 2014, Mother, through her legal counsel, filed her response to Adoptive Parents' petition and applications, and was represented by counsel at the November 11 hearing on Adoptive Parents' application to determine B.T.S. eligible for adoption without Mother's consent. Thus, our review of the record fails to disclose any prejudice or miscarriage of justice to Mother.

¶27 We also agree with Adoptive Parents that their failure to notify the BIA as required by § 40.4 was likewise without prejudice to Mother. It is unquestioned B.T.S. is an Indian child and member of the Chickasaw Nation. See 10 O.S. 2011 § 40.3(D)(E). No question is thus presented here about B.T.S.'s status that would require some determination by the BIA. No other tribal affiliation for B.T.S. has been asserted that would require some action in these proceedings by the BIA. Moreover, the § 40.4 notice to the BIA only states the parents, Indian custodian, and tribe have a right to intervene, not that the BIA has a right to intervene in voluntary or involuntary child custody proceedings.

¶28 We do not condone Adoptive Parents' failure to follow the notice requirements of OICWA particularly because that failure calls into question the rights of parents and Indian tribes and protracts the proceedings involving their rights and the custody and placement of children. It is in the interests of all to get it right the first time. However, where, as here, the record does not demonstrate the deficiencies resulted in prejudice to Mother, we will not reverse the trial court's judgment.

II. Required Burden of Proof

¶29 Mother does not argue the trial court erred in finding by clear and convincing evidence that B.T.S. is eligible for adoption without her consent. Instead, she argues the trial court applied the wrong standard of proof for the evidentiary requirements of ICWA and OICWA, in particular ICWA § 1912(f) which provides:

Parental rights termination orders; evidence; determination of damage to child

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Thus, Mother argues the heightened burden of proof beyond a reasonable doubt should have been applied. Moreover, Mother argues no "qualified expert witness" testified and "[n]owhere in the transcript is B.T.S.'s emotional and/or physical well-being discussed in the manner envisioned by § 1912(f)." We disagree with Mother's arguments.

¶30 As argued by Adoptive Parents, the present case does not involve a circumstance in which the child was in the custody of the parent. B.T.S. has not been in Mother's custody for eight years. Moreover, the present appeal concerns B.T.S.'s eligibility for adoption without Mother's consent, not termination of her parental rights. Section 1912(f) does not apply; thus, the heightened standard it requires does not apply.[8] "When making a determination of a child's eligibility for adoption without consent, an appellate court will review issues of fact under a clear and convincing standard." In re Adoption of G.D.J., 2011 OK 77, ¶ 17, 261 P.3d 1159 (citation omitted). In G.D.J., the Oklahoma Supreme Court explained:

[O]nly in a termination case of a putative father's parental rights, can a trial court simultaneously find consent is unnecessary, and terminate such rights. This is distinguished from a determination that a child is eligible for adoption without consent, which does not terminate parental rights.

Section 1912 of the ICWA requires the use of a "beyond a reasonable doubt" standard of proof, for certain purposes, in a proceeding to terminate parental rights. As discussed above, our statutes prohibit a trial court from taking any action that results in a termination of the parent-child relationship in a proceeding to determine a minor child eligible for adoption without the consent of a natural parent. Therefore, a "clear and convincing" standard of proof is all that is necessary in such a proceeding. The higher standard of proof is relevant to the specific determination, the continued custody of the child by the parent or Indian custodian, is likely to result in serious emotional or physical damage to the child. The hearing on the petition for adoption, which has not occurred in the present case, will be a proceeding which may result in the termination of a parent-child relationship, and is the only proceeding in which the court may grant a final decree of adoption. At the hearing on the petition for adoption, evidence relevant to matters included in subsection (f) of Section 1912 must be proven "beyond a reasonable doubt" in order to support a determination that parental rights should be terminated, including the testimony of an expert witness.

In re G.D.J., ¶¶ 35-36. See also In re J.S., 2008 OK CIV APP 15, ¶ 4, 177 P.3d 590 (heightened beyond a reasonable doubt standard of proof absent from the language of § 1912(d) and applies only to factual determination required by 1912(f) to be made in ICWA termination cases; lesser standard of clear and convincing evidence applicable to all other state law requirements for termination).

¶31 Similarly, because § 1912(f) does not apply under the facts of this case, expert testimony that the continued custody of B.T.S. by Mother is likely to result in serious emotional or physical damage to B.T.S. was not required.[9]

¶32 We therefore conclude the trial court did not err in applying a clear and convincing standard of proof.

III. Applicability of Oklahoma's Uniform Child Custody 
Jurisdiction and Enforcement Act

¶33 Mother argues the trial court was without subject matter jurisdiction to determine whether B.T.S. was eligible for adoption without her consent because at the time the application was made, guardianship over B.T.S. had been granted in 2007 in another county and was continuing. She argues the trial court erred in overruling her "position that the proper jurisdiction for the adoption would be in" the county where the guardianship was granted. Mother's argument is based on what she contends is the proper interpretation of Oklahoma's Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 43 O.S. 2011 §§ 551-101 through 551-402 as it relates to 10 O.S. 2011 § 7502-1.1. Section 7502-1.1 provides:

Jurisdiction over proceedings to terminate parental rights and proceedings for the adoption of a minor commenced pursuant to the Oklahoma Adoption Code shall be governed by the Uniform Child Custody Jurisdiction and Enforcement Act as provided in Sections 551-101 through 551-402 of Title 43 of the Oklahoma Statutes.

Pursuant to UCCJEA § 551-202,[10] Mother argues, the court with exclusive jurisdiction over the custody of B.T.S. is the guardianship court.

¶34 Mother does not argue there is ambiguity in some provision of UCCJEA or § 7502-1.1; rather, she argues the plain language of § 7502-1.1 requires the conclusion that the jurisdiction requirements of UCCJEA apply to proceedings for the termination of parental rights and adoption of a minor child filed under the Oklahoma Adoption Act, and that it would be nonsensical to interpret UCCJEA in such cases to apply only to interstate adoption jurisdiction disputes. Because, she argues, UCCJEA vests the court in the guardianship proceeding with exclusive jurisdiction and UCCJEA applies to termination of parental rights and adoption proceedings, Mother argues this Court must interpret UCCJEA such that wherever the word "state" appears, the word "county" must be inserted. She contends, "Even though [UCCJEA] was meant to deal with interstate issues, many states, including Oklahoma, have decided that its guidelines would also be effective in dealing with similar intra-state problems," and cites, by way of example, to 43 O.S. 2011 § 103(D).[11]

¶35 Mother concedes the purpose of UCCJEA "is to avoid jurisdictional conflict between courts of different states," citing Barnett v. Klein, 1988 OK 132, ¶ 12, 765 P.2d 777 (discussing predecessor Uniform Child Custody Jurisdiction Act (UCCJA), 43 O.S. §§ 501-527, repealed effective November 1, 1998) (emphasis added)).[12] See also Wood v. Redwine, 2001 OK CIV APP 115, ¶ 14, 33 P.3d 53 ("The jurisdictional provisions of [UCCJA] and, by implication, the successor provisions of [UCCJEA] seek to assure that litigation regarding custody of a child take place in the state with which the child and his family have the closest connection and where significant evidence concerning care and protection is readily available in order to provide a continuing stable environment for children.") (emphasis omitted) (citation omitted); and 43 O.S. 2011 § 551-401 ("In applying and construing [UCCJEA], consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it."). Nonetheless, Mother contends UCCJEA should be interpreted to have an intrastate purpose.

 

¶36 Mother's policy argument may not be wholly without merit. She argues the effective administration of justice and use of court resources, the use of litigant resources, and the best interests of a child might be served in adoption proceedings by rewriting UCCJEA such that wherever the word state appears, county should be inserted.[13] However, those and any other policy considerations and any revision of UCCJEA that might ensue are considerations and actions properly exercised by the Legislature and not this Court.

¶37 In Oklahoma, the judiciary lacks the power to rewrite a statute merely because the legislation does not comport with our or with an appealing party's concept of prudent public policy.

The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.

Okla. Const. Art. 4, § 1. The Oklahoma Supreme Court has stated: "In absence of a constitutional defect, we are duty bound to give effect to legislative acts, not to amend, repeal, or circumvent them. We will not exercise authority not vested in this Court by rewriting statutes merely because the legislation does not comport with our concept of prudent public policy." Coates v. Fallin, 2013 OK 108, ¶ 2, 316 P.3d 924 (citations omitted). The Supreme Court has further stated: "[T]he wisdom of choices made within the Legislature's law-making sphere are not our concern, because those choices - absent constitutional or other recognized infirmity - rightly lie within the legislative domain." Duncan v. Okla. Dep't of Corr., 2004 OK 58, ¶ 5, 95 P.3d 1076 (citation omitted).

¶38 Adoptions are not subject to UCCJEA § 551-103 and we agree with Mother that § 7502-1.1 specifically states adoption proceedings commenced pursuant to The Oklahoma Adoption Code are.[14] But, nothing in § 7502-1.1 states that UCCJEA, in such proceedings, applies to intrastate adoption proceedings. Clearly, as Mother herself points out, the Legislature is fully aware of the provisions of UCCJEA it has determined that courts should consider for venue matters in intrastate divorce actions. See, e.g., 43 O.S. 2011 § 103(D). It did not include similar language in § 7502-1.1 and nothing stated in that statute evinces a legislative intent to expand UCCJEA to purely intrastate adoption proceedings.

¶39 Consequently, we decline to usurp the Legislature's power to rewrite statutes and we find no legislative intent on the face of § 7502-1.1 or the provisions of UCCJEA to conclude the Legislature intended UCCJEA to apply to intrastate adoption proceedings. Therefore, we conclude the trial court was not without jurisdiction to determine B.T.S. eligible for adoption without Mother's consent and did not err in entering its Order.

IV. Correction of Order

¶40 Although she has failed to assert the issue in her appellate brief, in her application to the Supreme Court to convert her petition to assume original jurisdiction to a direct appeal, Mother asserts the Order is "fatally defective" on its face because it fails to "address the requirements of [ICWA and OICWA] in its findings of fact and conclusions of law." Mother had been directed by the Supreme Court to file a petition in error, and while she did so, she did not attach to it a statement of the issues to be raised on appeal. Her original petition in error did contain such a statement, but that statement did not include an issue about a "fatal defect" in the Order. Mother did not reference any authority for her assertion that the absence of any reference to ICWA and OICWA in the Order renders it fatally defective. Because no one contests B.T.S.'s status as an Indian child, the trial court's failure to make a finding of his status in the Order and, thus, that the provisions of ICWA and OICWA apply to these proceedings, while an error, is correctable. Thus, we modify and correct the Order to include the following: "B.T.S. is a member of the Chickasaw Nation and as such the provisions of the Federal Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 (2012), and the Oklahoma Indian Child Welfare Act, 10 O.S. 2011 §§ 40-40.9, apply in this case."

V. Request for Appeal-related Attorney Fees

¶41 Mother has requested in her appellate brief appeal-related attorney fees and costs. Her request does not comply with the requirements of Oklahoma Supreme Court Rule 1.14, 12 O.S. Supp. 2013, ch. 15, app. 1, and is denied.

CONCLUSION

¶42 Based on the applicable law and facts, we conclude the trial court properly exercised jurisdiction over this adoption proceeding, and although Adoptive Parents did not fully comply with the notice provisions of OICWA, Mother - who raised these notice deficiencies for the first time on appeal - had notice of her rights, fully participated in the proceedings, and was represented by counsel at all critical stages of the proceedings. We therefore conclude the error was harmless and the trial court properly determined the issue of whether B.T.S. was eligible for adoption without the consent of Mother. We further conclude the trial court applied the correct clear and convincing evidentiary standard in reaching the determination that B.T.S. was eligible for adoption without Mother's consent. Further, we decline Mother's request that we exercise the Legislature's power to rewrite statutes and we find no legislative intent on the face of § 7502-1.1 or the provisions of UCCJEA to conclude the Legislature intended UCCJEA to apply to intrastate adoption proceedings. We further conclude, however, because B.T.S. is an Indian child and the trial court properly applied the applicable provisions of ICWA and OICWA, the Order should be corrected to identify B.T.S. as a member of the Chickasaw Nation and to state that the provisions of ICWA and OICWA apply to this case. Finally, we deny Mother's request for appeal-related attorney fees and costs. Accordingly, we affirm the Order as corrected.

¶43 AFFIRMED AS CORRECTED.

THORNBRUGH, P.J., and RAPP, J., concur.

FOOTNOTES

[1] Section 7505-4.2 provides, in part, as follows:

B. Consent to adoption is not required from a parent who, for a period of twelve (12) consecutive months out of the last fourteen (14) months immediately preceding the filing of a petition for adoption of a child . . . has willfully failed, refused, or neglected to contribute to the support of such minor:

. . . .
2. According to such parent's financial ability to contribute to such minor's support if no provision for support is provided in an order. . . .

. . . .
H. 1. Consent to adoption is not required from a parent who fails to establish and/or maintain a substantial and positive relationship with a minor for a period of twelve (12) consecutive months out of the last fourteen (14) months immediately preceding the filing of a petition for adoption of the child.

[2] Father has not appealed. Mother filed an Application to Assume Original Jurisdiction, Application for Stay, Petition for Writ of Prohibition, and Petition for Writ of Mandamus with the Oklahoma Supreme Court and a brief in support. A hearing had been scheduled, but at Mother's request, the hearing was stricken and Mother was ordered to inform the Supreme Court whether she intended to pursue the appeal or be dismissed. Mother then filed a petition to convert the case to a direct appeal pursuant to Oklahoma Supreme Court Rule 1.23(d). The Supreme Court granted her application to convert in part by allowing the cause to be recast as an appeal from a final order pursuant to Rules 1.23(d), 1.10(c)(3) and 1.34(e), but denied Mother's request to excuse her from filing a petition in error and designation of record. She was also directed to seek in the district court her request for waiver of district court fees.

[3] That section provides as follows:

In all Indian child custody proceedings of [OICWA], including voluntary court proceedings and review hearings, the court shall ensure that the . . . person initiating the proceeding shall send notice to the parents or to the Indian custodians, if any, and to the tribe that is or may be the tribe of the Indian child, and to the appropriate Bureau of Indian Affairs area office, by certified mail return receipt requested. The notice shall be written in clear and understandable language and include the following information:

1. The name and tribal affiliation of the Indian child;
2. A copy of the petition by which the proceeding was initiated;
3. A statement of the rights of the biological parents or Indian custodians, and the Indian tribe:

a. to intervene in the proceeding,
b. to petition the court to transfer the proceeding to the tribal court of the Indian child, and
c. to request an additional twenty (20) days from receipt of notice to prepare for the proceeding; further extensions of time may be granted with court approval;

4. A statement of the potential legal consequences of an adjudication on the future custodial rights of the parents or Indian custodians;
5. A statement that if the parents or Indian custodians are unable to afford counsel, counsel will be appointed to represent them; and
6. A statement that tribal officials should keep confidential the information contained in the notice.

(Emphasis added.)

[4] Br-in-chief at 5.

[5] Although Mother asserts the OICWA notice requirements were not followed, she also references the ICWA notice requirement found in § 1912, which provides, in part, as follows:

(a) Notice; time for commencement of proceedings; additional time for preparation

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the . . . termination of parental rights to an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary[.]

(Emphasis added.)

[6] While we have found no Oklahoma Supreme Court cases addressing the precise issue here raised concerning § 1912 and OICWA § 40.4, in Cherokee Nation v. Nomura, 2007 OK 40, 160 P.3d 967, the Oklahoma Supreme Court discussed the required § 40.4 notice to Indian tribes regardless of whether the child custody proceedings are voluntary or involuntary. Having determined notice had not been given to the tribe, the Supreme Court observed: "Under the circumstances of this case, no attempt whatsoever was made to involve the Tribe in the placement of the child. Agency's allegations that the Tribe was given notice and intervened in Florida are hollow attempts to justify the actions taken after the judgment was entered." Id. ¶ 29 (emphasis added). While we do not construe this statement as a holding by the Supreme Court that defective notice under § 40.4 can be cured by actual involvement or notice prior to entry of judgment, the Court's statement indicates it has not precluded that conclusion.

This conclusion finds further support from the Supreme Court's reasoning in In re Adoption of R.R.R., 1988 OK 109, 763 P.2d 94. There a grandmother sought to adopt the minor child because the child was living with her and the parents had not supported the child in over a year. The mother could not be located and was served by publication, but the father had actual notice and filed a motion for summary judgment on grounds not here pertinent, which the trial court granted. The Supreme Court reversed the grant of summary judgment and remanded the case for new trial. The child was a member of the Kiowa Tribe and the tribe, along with the BIA, had been notified of the adoption proceeding. The tribe filed a motion to intervene; however, the record revealed it did not have notice of the summary judgment hearing. In determining that the tribe on remand for a new trial was not precluded from seeking transfer to its tribal courts, the Oklahoma Supreme Court reasoned:

In compliance with [OICWA] § 40.4, the Kiowa Tribal Office and the area office of the Bureau of Indian Affairs were notified. The Kiowa Tribe filed a motion to intervene, but it did not request removal to a tribal court nor did it participate in any subsequent proceedings. (Neither the Tribe nor the Bureau of Indian Affairs were given notice of the November 1, 1985 hearing. This would invalidate those proceedings in so far as the Tribe's interest is concerned.)

1988 OK 109, ¶ 17 (footnotes omitted). The Supreme Court specifically noted the trial court's minute stated the Kiowa Tribe was not present for the hearing and had received no notice of the hearing. In the present case, Mother had notice - albeit not in full conformity with OICWA § 40.4 - of the pre-adjudicatory proceedings, was represented by counsel, fully participated in the hearing, and had access to the filings in the record.

In fact, the circumstances here - where the issue is for the first time presented on appeal - are not unlike those addressed by the Supreme Court in In re N.L., 1988 OK 39, 754 P.2d 863, where a mother challenged the sufficiently of the notice under OICWA of a pre-adjudication order because the emergency custody order did not contain the requisite affidavits required by § 40.5. Because the mother had not raised those issues at the trial level, the Supreme Court said it could not review those issues on appeal. In re N.L., ¶ 8. The Supreme Court reasoned:

No motion or argument appears in the trial court record questioning the statutory sufficiency of the amended petition. Similarly, no motion or argument was addressed to the trial court attacking the temporary custody orders for lack of a hearing pursuant to 10 O.S. Supp. 1984 § 1104.1. No reference to 25 U.S.C. § 1922 appears in the trial court record before us.

A party may not assign errors on appeal which were not presented to the trial court.

The misapplication of 10 O.S. Supp. 1984 § 1104.1, 10 O.S. Supp. 1982 § 40.5, 25 U.S.C. § 1922 does not defeat the jurisdiction of the trial court.

In re N.L., ¶¶ 9-11 (citations omitted) (footnote omitted). As to the jurisdictional issue, the Court stated:

The trial court's jurisdiction includes the jurisdiction over the parties, jurisdiction over the subject matter, and jurisdictional power to pronounce the particular judgment rendered. Jurisdiction over the subject matter occurs upon the filing of the petition. 10 O.S. 1981 § 1102. The mother appeared with counsel in the proceedings. The trial court has jurisdictional power to specify the appropriate conduct for a parent. 10 O.S. Supp. 1982 § 1116.

In re N.L., ¶ 11 n.2 (citation omitted). The Court concluded:

The mother's allegations of error that the trial court failed to follow 25 U.S.C. § 1922, 10 O.S. Supp. 1982 § 40.5, and 10 O.S. Supp. 1984 § 1104.1, do not come within exceptions to the general rule that allegations of error must be presented to the trial court. Therefore, they are beyond the scope of our review on appeal.

In re N.L., ¶ 13.

[7] Adoptive Parents assert in their appellate brief that on July 28, 2014, the Chickasaw Nation responded "via letter, confirming [Father's] Certificate of Degree of Indian Blood (CDIB), and indicating it was the practice of the Chickasaw Nation not to intervene in family matters, such as family adoption. To date, the Chickasaw Nation has never sought to intervene in this matter." The referenced letter is not part of the record and, thus, no evidence has been presented about what the Chickasaw Nation's "practice" is or is not in family adoptions. However, the record on appeal confirms Adoptive Parents' assertion that the Chickasaw Nation has not intervened in this matter.

[8] See e.g., In re Adoption Couple v. Baby Girl, 133 S. Ct. 2552 (2013), wherein the Supreme Court of the United States observed:

Section 1912(f) addresses the involuntary termination of parental rights with respect to an Indian child. Specifically, § 1912(f) provides that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

Id. at 2560. 

[9] Mother does not argue on appeal that clear and convincing evidence failed to support the trial court's determination; however, our review of the record and the transcript reveals the Order is supported by clear and convincing evidence. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." In re C.G., 1981 OK 131, ¶ 17 n.12, 637 P.2d 66 (citations omitted). We further note, as stated by the Oklahoma Supreme Court in White v. Adoption of Baby Boy D, 2000 OK 44, 10 P.3d 212: "Although the veracity of the parties' testimony before the trial judge was called into question and conflicting testimony abounded, we are confident in the advantage given the trial judge to determine witnesses' credibility." Id. ¶ 36 (citation omitted). The Supreme Court further explained: "The trial judge, by being confronted with the parties and the witnesses, was in a much better position to assess the credibility of those witnesses than is this Court from 'the dry, printed words in the record.'" Id. (citation omitted).

[10] Section 551-202 provides:

A. Except as otherwise provided in [§ 551-204 temporary emergency custody] of this act, a court of this state which has made a child custody determination consistent with [§ 551-201initial child custody jurisdiction] or [§ 551-203 jurisdiction to modify determination] of this act has exclusive, continuing jurisdiction over the determination until:

1. A court of this state determines that neither the child, the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

2. A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

[11] Section 103, entitled "Venue for any action for divorce, annulment of a marriage, or legal separation," provides, in part, as follows:

D. The court shall grant a party's application for change of venue when the court determines that it is an inconvenient forum under the circumstances and the court in another county is a more appropriate forum consistent with the factors in subsection B of Section 551-207 of the Uniform Child Custody Jurisdiction and Enforcement Act after substitution of the word "county" for the word "state" in such section of the act, and transfer is requested to the county where the applying party resides in the state.

(Emphasis added.)

[12] The Barnett Court further stated, "Language involving intrastate jurisdictional and venue disputes is conspicuously absent [from the statute]. The legislature having not seen fit to make the Act apply in purely intrastate controversies, we acknowledge that it does not apply in this case." Id.

[13] We note, however, in the present case, Mother concedes the guardianship court was aware of this proceeding and determined to wait to rule on Mother's petition to vacate the guardianship pending the decision in this proceeding. Thus, judicial economy has been served in this case.

[14] In fact, § 7502-1.1 is consistent with the Official Comment to § 551-103, which states:

Two proceedings are governed by other acts. Adoption cases are excluded from this Act because adoption is a specialized area which is thoroughly covered by the Uniform Adoption Act (UAA) (1994). Most States either will adopt that Act or will adopt the jurisdictional provisions of that Act. Therefore the jurisdictional provisions governing adoption proceeding are generally found elsewhere.

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2001 OK CIV APP 115, 33 P.3d 53, 72 OBJ 2968, WOOD v. REDWINE
Discussed
 2003 OK CIV APP 24, 67 P.3d 359, IN THE MATTER OF THE ADOPTION OF BABY GIRL B.
Discussed
 2008 OK CIV APP 15, 177 P.3d 590, IN THE MATTER OF J.S.
Discussed
 2011 OK CIV APP 26, 251 P.3d 183, MALLOY v. CALDWELL
Discussed
 2013 OK CIV APP 45, 302 P.3d 1168, E&F COX FAMILY TRUST v. CITY OF TULSA
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 39, 754 P.2d 863, 59 OBJ 1069, N.L., Matter of
Discussed
 1988 OK 109, 763 P.2d 94, 59 OBJ 2651, Adoption of R.R.R., Matter of
Discussed at Length
 1988 OK 132, 765 P.2d 777, 59 OBJ 3222, Barnett v. Klein
Discussed
 1993 OK 85, 859 P.2d 1081, 64 OBJ 2009, Kluver v. Weatherford Hosp. Authority
Discussed
 1971 OK 18, 481 P.2d 744, FALLETTI v. BROWN
Discussed
 1973 OK 141, 516 P.2d 534, KARRIMAN v. ORTHOPEDIC CLINIC
Discussed
 2004 OK 33, 91 P.3d 646, IN RE: A.N.O., A MINOR CHILD
Discussed
 2004 OK 58, 95 P.3d 1076, DUNCAN v. OKLAHOMA DEPT. OF CORRECTIONS
Discussed
 2007 OK 40, 160 P.3d 967, CHEROKEE NATION v. NOMURA
Discussed
 2011 OK 77, 261 P.3d 1159, IN THE MATTER OF THE ADOPTION OF G.D.J.
Discussed at Length
 2012 OK 31, 276 P.3d 1017, STATE v. TATE
Discussed
 2013 OK 108, 316 P.3d 924, COATES v. FALLIN
Discussed
 2000 OK 44, 10 P.3d 212, 71 OBJ 1583, WHITE v. ADOPTION OF BABY BOY D.
Discussed
 1981 OK 131, 637 P.2d 66, C. G., Matter of
Discussed
 1998 OK 110, 981 P.2d 1244, 69 OBJ 3784, Halliburton v. Grothaus
Discussed
Title 10. Children
 Cite
Name
Level

 10 O.S. 29.1, Repealed by Laws 1997, HB 1241, c. 366, § 60, eff. November 1, 1997
Cited
 10 O.S. 40.3, Application of Act - Exemptions - Determination of Indian Status
Cited
 10 O.S. 40.4, Involuntary Indian Child Custody Proceedings - Notice
Cited
 10 O.S. 40.5, Emergency Removal of Indian Child from Parent or Custodian - Order
Discussed
 10 O.S. 1102, Renumbered as 10 O.S. § 7303-1.2 by Laws 1995, HB 1978, c. 352, § 199, emerg. eff. July 1, 1995
Cited
 10 O.S. 1104.1, Renumbered as 10 O.S. § 7003-3.2 by Laws 1995, HB 1978, c. 352, § 199, emerg. eff. July 1, 1995
Discussed at Length
 10 O.S. 1116, Renumbered as 10 O.S. § 7003-5.5 by Laws 1995, HB 1978, c. 352, § 199, emerg. eff. July 1, 1995
Cited
Title 43. Marriage
 Cite
Name
Level

 43 O.S. 551-101, Short Title
Cited
 43 O.S. 551-401, Application and Construction
Cited
 43 O.S. 103, Venue - Divorce, Annulments, and Separate Maintenance
Discussed